# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT WINCHESTER

DAVID J. MARTIN,             )
                                  )
      *Plaintiff,*          )
                                  )    **JURY DEMAND**
v.                                )
                                  )    Case No.
JUSTIN COLWELL, individually, and the  )
CITY OF MCMINNVILLE, TENNESSEE, )
                                  )
      *Defendants.*      )

---

## COMPLAINT

---

COMES NOW, the Plaintiff, David J. Martin, by and through counsel, Michael D. Galligan and Bailey D. Barnes, and levies the following allegations against the Defendants, Justin Colwell and the City of McMinnville, Tennessee:

### I.     PARTIES

1. Plaintiff David J. Martin ("Mr. Martin") is a citizen of the United States of America and a resident of Warren County, Tennessee residing at 123 Northgate Drive, McMinnville, Tennessee 37110.

2. Defendant Justin Colwell ("Officer Colwell") is a citizen of the United States of America and a resident of Warren County, Tennessee.

3. Officer Colwell is a Defendant in his individual capacity.

4. Officer Colwell is employed as a police officer with the McMinnville Police Department for the City of McMinnville, Tennessee.

- 1 -

5. Officer Colwell was an employee of the McMinnville Police Department at all relevant times related to the claims brought in this Complaint.

6. Defendant City of McMinnville, Tennessee ("McMinnville Police Department") is a municipal corporation existing in the State of Tennessee.

## II.     JURISDICTION & VENUE

7. This Court has federal question subject matter jurisdiction over this action because the claims brought in this Complaint arise under the Constitution and laws of the United States in accordance with 28 U.S.C. § 1331.

8. This Court has general personal jurisdiction over the parties as both Mr. Martin and Officer Colwell are domiciliaries of the State of Tennessee.

9. Venue is proper in this Court because Officer Colwell and McMinnville Police Department reside in Warren County, Tennessee, and all events giving rise to the claims alleged herein occurred in McMinnville, Warren County, Tennessee.

## III.     FACTS

A. *Relevant History of the Ku Klux Klan Act of 1871*

10. Following the United States Civil War, the Reconstruction Congress had to grapple with increasing political and racial violence primarily in the South, including and especially in Tennessee.

11. With the rise of the Ku Klux Klan, which was formed in Pulaski, Tennessee by a group of disgruntled, racist former Confederate military members, a reign of terror against Black citizens and those who supported the Union and Reconstruction spread across the region.

- 2 -

12. The Reconstruction Congress heard testimony of sheriffs who would not arrest or pursue those who committed acts of violence, prosecutors who would not bring cases against the offenders, judges who would turn blind eyes to abuses of constitutional or statutory rights, and jurors who would nullify the law rather than convict vigilante domestic terrorists.

13. In response, and at President Ulysses S. Grant's urging, Congress passed the Ku Klux Klan Act of 1871, the first section of which is now codified as 42 U.S.C. 1983.

14. Situated within this historical context, 42 U.S.C. § 1983 serves a critical, necessary purpose in protecting the essential interests and basic humanity of citizens who have been deprived of constitutional or statutory rights by those acting under color of state law.

15. It is through this very law that Mr. Martin, a Black man, seeks to have his rights protected from abuses by an officer armed with state authority who removed Mr. Martin from his own property without any constitutional or statutory justification for doing so.

16. Mr. Martin looks to the judicial system of the government of the United States, as is his right under the Ku Klux Klan Act of 1871, 42 U.S.C. § 1983, to shield him from abuse when the state is unwilling or unable to do so on its own.

B. *Officer Colwell's Unlawful Interaction with David Martin*

17. On September 10, 2021, around 3:30 PM CT, Mr. Martin had returned to his home from his daily half-hour walk with his dog around his neighborhood.

18. After Mr. Martin had turned the water on to shower, Mr. Martin stepped outside to put his trash into the city-provided trash bins for pickup.

19. Mr. Martin was not wearing a shirt and was wearing denim shorts.

20. While in his backyard, Mr. Martin heard a woman screaming, "Help me! Help me! Help me!"

- 3 -

21. Mr. Martin then observed that the woman was standing in *his backyard*.

22. The woman, named Anglia Elain Carroll ("Ms. Carroll"), was hysterical upon her first contact with Mr. Martin.

23. Concerned for the woman's safety, and aware that another individual was contacting 911, Mr. Martin told Ms. Carroll to remain with him in his backyard while they waited for the police to arrive.

24. At the same time, 911 had received a call regarding a potential physical domestic assault involving Ms. Carroll as the suspect.

25. Warren County 911 dispatched Officer Colwell to the scene.

26. While travelling to the scene, Officer Colwell received the following information from 911 dispatch:

   a. A female had grabbed her boyfriend's penis and was pulling him around by it at 205 Davis Street in McMinnville;

   b. A female at that location was "acting crazy;"

   c. The male victim was remaining inside the home and was unable to walk;

   d. There were *no weapons, drugs, or alcohol* on the scene;

   e. The female's name was Angela Conley [sic];

   f. The female had *gone to a neighbor's yard*; and

   g. The female was remaining in the *neighbor's yard*.

27. Upon Officer Colwell's arrival, despite these clear indications from dispatch that the suspect was in a *neighbor's yard*, Officer Colwell approached Mr. Martin.

- 4 -

28. Officer Colwell, standing in Mr. Martin's own backyard, asked Mr. Martin where he lived, to which Mr. Martin responded that he lived in the house attached to the yard in which they were standing.

29. Officer Colwell, standing in Mr. Martin's own backyard, asked Mr. Martin if he had seen anything that had gone on at the scene.

30. Mr. Martin responded by stating that he "pleaded the fifth" because he did not see anything.

31. Mr. Martin did not want to falsely state that he knew anything about what was going on other than that a hysterical individual was in his yard seeking help.

32. Officer Colwell informed Mr. Martin that he was going to conduct a pat down of Mr. Martin for weapons.

33. Mr. Martin, who posed no reasonable threat to Officer Colwell based on dispatch's communications with the officer, refused the pat down.

34. Unsatisfied, apparently, with Mr. Martin's answers, Officer Colwell decided to place Mr. Martin in handcuffs in *his own backyard*.

35. Mr. Martin had committed no crime, and posed no threat to Officer Colwell.

36. Officer Colwell told Mr. Martin to put his hands behind his back.

37. Mr. Martin responded by asking, "for what?"

38. Mr. Martin attempted to step back and away from Officer Colwell.

39. Officer Colwell aggressively handcuffed Mr. Martin.

40. Officer Colwell placed the handcuffs on Mr. Martin more tightly than necessary.

41. Mr. Martin complained to Officer Colwell that the handcuffs were too tight.

42. Officer Colwell ignored Mr. Martin's complaints about the handcuffs.

- 5 -

43. Despite having committed no offense, and being in his own backyard at his own house, Officer Colwell detained Mr. Martin in the back of his patrol vehicle.

44. Mr. Martin remained in the back of Officer Colwell's patrol vehicle in tight handcuffs for approximately fifteen minutes.

45. Mr. Martin has screws in his ankles from a prior injury that can cause pain if situated a certain way.

46. Mr. Martin's ankle was in serious discomfort while being unnecessarily detained in the rear of Officer Colwell's patrol vehicle.

47. At some point, Officer Colwell returned to his patrol vehicle to tell Mr. Martin that he would be released.

48. Mr. Martin complained that the handcuffs were too tight, and his ankles were in pain because of the screws in them.

49. Officer Colwell once again ignored Mr. Martin's complaints and shut the door in Mr. Martin's face.

50. After a few more minutes passed with Mr. Martin remaining handcuffed in the back of the police vehicle, Officer Colwell finally released Mr. Martin from the back of the squad car.

51. While freeing Mr. Martin, Officer Colwell wrongly asserted that he possessed the authority to arrest Mr. Martin for resisting Officer Colwell during the initial encounter.

52. Officer Colwell further told Mr. Martin that when police arrive on a scene, they do not know what is going on and because Mr. Martin wanted to plead the Fifth, Officer Colwell wanted to make sure that Mr. Martin did not have any weapons on him.

53. Officer Colwell never articulated the suspicion that prompted him to attempt to pat down Mr. Martin.

54. Mr. Martin's wrists swelled for days following being handcuffed too tightly by Officer Colwell.

55. Mr. Martin continued to feel pain in his ankles following his unnecessary detention in Officer Colwell's patrol vehicle.

56. Mr. Martin suffered stress and anxiety related to his encounter with Officer Colwell, which occurred in Mr. Martin's own backyard; thereby, reducing Mr. Martin's sense of security.

57. Mr. Martin filed a complaint with the McMinnville Police Department regarding Officer Colwell's conduct.

58. Mr. Martin complained to the McMinnville Police Department about the injuries to his wrist and pain in his ankle because of Officer Colwell's conduct.

59. The McMinnville Police Department conducted a sham internal affairs investigation that found that Officer Colwell followed departmental protocols during his interaction with Mr. Martin.

60. Mr. Martin lives to this day with the memory of those charged with protecting him and his community violently, unjustly, and painfully violating his rights in his own backyard as he tried to help a hysterical woman who clearly needed help.

61. Mr. Martin's harm was only compounded by the failure of the McMinnville Police Department, and those charged with overseeing it, to take reasonable and necessary actions to ensure his attacker, Officer Colwell, was held accountable for his actions.

62. Officer Colwell and the McMinnville Police Department failed to carry out their duties justly and equitably in their interactions with Mr. Martin.

*C. McMinnville Police Department's Failure to Train, Supervise, & Discipline Officer Colwell*

63. This was not the first incident involving unconstitutional conduct by Officer Colwell against a citizen while armed with the authority granted to him by the McMinnville Police Department.

64. Officer Colwell entered the Field Training and Evaluation Program with the McMinnville Police Department on November 14, 2016.

65. Officer Colwell received POST Certification on June 23, 2017.

66. Officer Colwell was admitted as a full-duty police officer for the McMinnville Police Department on August 7, 2017.

67. Less than three years after starting the job, Officer Colwell displayed signs of significant anger issues on the job.

68. On June 29, 2020, Officer Colwell engaged in unconstitutional, unprofessional, unbecoming, and unacceptable conduct with an arrestee.

69. On June 29, 2020, Officer Colwell responded to a gas station based on a call regarding an intoxicated individual.

70. Upon arriving to the scene, Officer Colwell attempted to do a field sobriety test of the Suspect.[1]

71. The Suspect had recently undergone major back surgery that had involved the placement of a rod in the Suspect's back that required the Suspect to use a walker to walk.

72. This made doing a field sobriety test difficult.

73. The Suspect did not perform well on the field sobriety test.

74. Officer Colwell placed the Suspect under arrest.

---

[1] To maintain this arrestee's privacy, the arrestee will be referred to herein only as "Suspect."

75. Officer Colwell searched the Suspect and found a pill in the Suspect's pocket.

76. Officer Colwell instructed the Suspect to have a seat in the squad car.

77. Prior to sitting, Officer Colwell asked the Suspect to take a breathalyzer test.

78. The Suspect refused the breathalyzer test because the Suspect claimed he was not the person who had been driving the vehicle.

79. Officer Colwell again asked the Suspect to get into the squad car.

80. When the Suspect did not quickly get into the back seat of the squad car, because it was difficult for the Suspect to maneuver his body given the significant back surgery he had recently undergone, Officer Colwell used force to push the Suspect into the back seat.

81. The Suspect claimed that Officer Colwell kneed the Suspect in the back.

82. Officer Colwell told the Suspect, after the struggle to put the Suspect in the vehicle, "If you do something stupid, I will spray your ass!"

83. Following further cussword-laden argument, Officer Colwell, apparently believing he was empowered to serve as the prosecutor, judge, and jury, stated, "I don't give a shit what you got on.  You're gonna get in my car when I tell you to. I don't know who you think you are. We'll see in about six months when you don't have a license. *I'm gonna take them*." (emphasis added).

84. The Suspect called Officer Colwell "fat," and told Officer Colwell to "Keep on running your mouth."

85. To this, Officer Colwell responded, "You're not going to do nothing. You're all talk. That's why your daughter has so many problems. You fucked up."

86. After some inaudible yelling from the Suspect, Officer Colwell tells the Suspect, who had to use a walker to walk and was in handcuffs in the back of a police squad car, "You

- 9 -

threatening me again? What's that supposed to mean that you will see me in town? ***I'll fuck you up, dude, in town***. I don't give a shit. You come to me in town, ***I will kill your ass***." (emphasis added).

87. Officer Colwell again stated, "You come up to me in town, I'm gonna fuck you up."

88. Finally, while still at the scene, Officer Colwell told the Suspect, "You're Retarded."

89. At the sally port at the Warren County Jail, Officer Colwell again escalated the situation.

90. In the presence of six correctional officers and one judicial commissioner, Officer Colwell and the Suspect engaged in another heated exchange.

91. At some point during the exchange, Officer Colwell removed his badge and set it on a table while continuing to threaten to harm the Suspect.

92. In response to this parade of terrible, unprofessional, unethical, and unconstitutional actions by Officer Colwell, the McMinnville Police Department did little to nothing.

93. The Suspect filed a complaint against Officer Colwell with the McMinnville Police Department directed to the Chief of Police.

94. The Police Chief was on notice of Officer Colwell's temper and need for discipline, training, and supervision.

95. The McMinnville Police Department found that Officer Colwell violated departmental policies.

96. The McMinnville Police Departments' Captain at the time, who is now the Chief of Police for the City of McMinnville, was part of the investigation into Officer Colwell's conduct, and was thus on notice of Officer Colwell's temper and need for discipline, training, and supervision.

- 10 -

97. The McMinnville Police Department, along with the concurrence of the Chief and Captain (now Chief), did not suspend or terminate Officer Colwell.

98. The McMinnville Police Department gave a written reprimand to Officer Colwell, who had threatened to **kill** an arrestee who could not walk unaided and who was handcuffed in the back of a police squad car.

99. The McMinnville Police Department wholly inadequate discipline was for Officer Colwell to do what amounted to an elementary school "write off," by writing at the bottom of the reprimand, "I will not let suspects or the public get under my skin."

100. The McMinnville Police Department, along with its leadership, the former Chief and Captain (now Chief), knew it had an officer who had an uncontrolled temper, who had threatened to kill an arrestee, who had removed his badge in front of an arrestee in an apparent attempt to remove State authority, and yet, McMinnville Police Department did basically nothing to prevent this from happening again.

101. Upon information and belief, the McMinnville Police Department did not require Officer Colwell to, nor did he, attend any sort of training in de-escalation or anger management related to his interaction with the Suspect.

102. Additionally, McMinnville Police Department, acting through Sergeant Justin Shrum, had instructed Officer Joseph Butler to take a body camera to Officer Colwell, who had not been wearing one, approximately one month prior to Officer Colwell's interaction with Mr. Martin.

103. The McMinnville Police Department did not follow up at all on this dictate.

104. McMinnville Police Department policy declares, "It is the policy of the McMinnville Police Department that officers shall activate Mobile Video Systems when such use is

appropriate to the proper performance of his or her official duties, where the recordings are consistent with the policy and law. . . [In-Car Video] and [Body-Worn Camera System] video recording devices are used to record the audio and visual elements of citizen encounters, traffic stops, arrests and other events of criminal or evidentiary significance."

105. Despite this policy, and Sergeant Shrum directing that Officer Colwell wear a body camera, Officer Colwell continued not to wear a body camera.

106. Officer Colwell did not activate a body camera or in-car video system during his encounter with Mr. Martin, as a result of the McMinnville Police Department's failure to enforce its own policies and procedures.

107. The McMinnville Police Department has entirely failed to adequately train, supervise, or discipline Officer Colwell so as to prevent Officer Colwell's known temper and instability from causing constitutional violations while acting with the authority of the McMinnville Police Department.

108. The McMinnville Police Department has acted with abject indifference regarding Officer Colwell's lack of discipline, hostile temperament, and deficient professionalism.

IV.    CAUSES OF ACTION

A. *Excessive Force – U.S. Const. amend. IV – 42 U.S.C. § 1983 (2018)*

109. Mr. Martin expressly incorporates every paragraph of this Complaint as if fully set forth within this cause of action.

110. Mr. Martin is a citizen and resident of the United States of America.

111. Officer Colwell deprived Mr. Martin of his right to be free from unreasonable searches and seizures while Officer Colwell was acting under color of state law.

- 12 -

112. Officer Colwell was exercising the State of Tennessee's police power during his interaction with Mr. Martin.

113. Officer Colwell acted with actual authority on behalf of the State during his interaction with Mr. Martin.

114. Officer Colwell forcefully handcuffed Mr. Martin.

115. Officer Colwell handcuffed Mr. Martin too tightly.

116. Officer Colwell handcuffed Mr. Martin more tightly than would a reasonable officer.

117. Mr. Martin complained to Officer Colwell multiple times that the handcuffs were too tight.

118. Officer Colwell ignored Mr. Martin's complaints that the handcuffs were too tight.

119. Mr. Martin complained to Officer Colwell multiple times that Mr. Martin's ankles were hurting while he was unlawfully arrested in the back of Officer Colwell's squad.

120. Officer Colwell ignored Mr. Martin's complaints about the pain in Mr. Martin's ankles.

121. Mr. Martin suffered physical injuries because Officer Colwell placed the handcuffs on Mr. Martin too tightly.

122. Mr. Martin suffered physical injuries because Officer Colwell handcuffed Mr. Martin too tightly and refused to loosen Mr. Martin's handcuffs following Mr. Martin's complaints.

123. Mr. Martin's physical injuries included, but were not necessarily limited to, swelling of his wrists, bruising of his wrists, and pain in his ankles.

124. Mr. Martin also suffered emotional injuries because of Officer Colwell's excessive force.

125. Officer Colwell seized Mr. Martin from his own backyard while trying to be a good Samaritan, and the long arm of the law, personified by Officer Colwell, erroneously, unjustly, and inequitably harmed Mr. Martin.

*B. False Arrest & Unreasonable Seizure – U.S. Const. amend. IV – 42 U.S.C. § 1983 (2018)*

126. Mr. Martin expressly incorporates every paragraph of this Complaint as if fully set forth within this cause of action.

127. Mr. Martin is a citizen and resident of the United States of America.

128. Officer Colwell deprived Mr. Martin of his right to be free from unreasonable searches and seizures while Officer Colwell was acting under color of state law.

129. Officer Colwell was exercising the State of Tennessee's police power during his interaction with Mr. Martin.

130. Officer Colwell acted with actual authority on behalf of the State during his interaction with Mr. Martin.

131. Officer Colwell ignored dispatch's communications regarding the actual suspect in this domestic incident, the woman in the neighbor's yard.

132. Officer Colwell ignored dispatch's communications that the suspect, again a woman, was in a neighbor's yard away from the initial scene.

133. Officer Colwell ignored dispatch's communications that the alleged victim was inside of a house where the alleged crime took place, not in the neighbor's yard, which was where the woman suspect was located.

134. At no point did dispatch relay to Officer Colwell on his way to the scene that anyone matching Mr. Martin's description posed any harm to anyone.

135. Dispatch relayed that the suspect, a woman, was in the neighbor's yard.

136. Dispatch relayed that no weapons, drugs, or alcohol were believed to be present at the scene.

137. Despite dispatch's communications, Officer Colwell told Mr. Martin that Officer Colwell does not know what to expect when he arrives on a scene and that when Mr. Martin said he "pleads the fifth," Officer Colwell needed to check for weapons.

138. Officer Colwell did not have reasonable suspicion that Mr. Martin was armed.

139. Officer Colwell did not, and could not have reasonable suspicion to believe that Mr. Martin had committed a crime given dispatch's clear communications that the woman was the suspect, the alleged victim was inside the other house, and the suspect was in a neighbor's yard.

140. Officer Colwell never gained reasonable suspicion to believe that Mr. Martin was armed or that Mr. Martin had committed a crime.

141. Officer Colwell did not have probable cause to arrest Mr. Martin for any offense.

142. Officer Colwell never gained probable cause to arrest Mr. Martin for any offense.

143. Officer Colwell did not possess an arrest warrant for Mr. Martin.

144. Officer Colwell seized Mr. Martin, placed him in handcuffs, and locked him in the backseat of Officer Colwell's squad car for approximately fourteen to fifteen minutes.

145. Mr. Martin did not feel free to leave the backseat of Officer Colwell's vehicle while handcuffed and locked inside the vehicle.

146. Officer Colwell deprived Mr. Martin of his liberty.

147. Officer Colwell did not merely detain Mr. Martin for a brief investigatory purpose; though, even if Officer Colwell only did detain Mr. Martin, Officer Colwell did not have reasonable suspicion to support the detention.

148. Officer Colwell turned a blind eye toward significant exculpatory evidence for Mr. Martin.

149. Officer Colwell ignored all of dispatch's communications, forcefully seized Mr. Martin for declining a pat down that was unsupported by any reasonable suspicion of Mr. Martin being armed, and removed Mr. Martin from his own backyard where Mr. Martin was serving as a good Samaritan and good neighbor to a hysterical woman seeking help.

150. Officer Colwell, who has a history of losing his temper, acted without reasonable suspicion or probable cause because Mr. Martin did not immediately accede to Officer Colwell's every whim and unlawful command.

151. Officer Colwell's arrest of Mr. Martin was based not on reasonable suspicion or probable cause, but on retaliation for Mr. Martin's decision to question Officer Colwell's claims to authority when Mr. Martin had done nothing wrong in his own backyard.

152. Officer Colwell's actions flew in the face of the Fourth Amendment to the United States Constitution.

153. Officer Colwell, acting with the full force of State authority, removed Mr. Martin from his own home and land and placed him in police custody for no constitutionally permitted reason.

C. *Municipal Liability – Failure to Train, Supervise, or Discipline – 42 U.S.C. § 1983 (2018)*

154. Mr. Martin expressly incorporates every paragraph of this Complaint as if fully set forth within this cause of action.

155. The McMinnville Police Department, acting through its leaders and policymakers the former and current Chief of Police, had a municipal policy or custom that caused Mr. Martin's injuries.

- 16 -

156. The McMinnville Police Department, acting through its leaders and policymakers the former and current Chief of Police, failed to adequately train, supervise, and discipline Officer Colwell.

157. Upon information and belief, the McMinnville Police Department, acting through its leaders and policymakers the former and current Chief of Police, did not train Officer Colwell on de-escalation techniques and anger management.

158. The McMinnville Police Department, acting through its leaders and policymakers the former and current Chief of Police, did not adequately supervise Officer Colwell in that there were no substantive consequences for Officer Colwell's unconstitutional actions in June 2020 and Officer Colwell was not required to follow McMinnville Police Department policy regarding camera usage on duty.

159. The McMinnville Police Department, acting through its leaders and policymakers the former and current Chief of Police, failed to appropriately discipline Officer Colwell for his ***grave and serious*** unconstitutional actions in June 2020, which included threatening to ***kill*** an arrestee who was not able to walk unaided, who was handcuffed in a squad car.

160. The McMinnville Police Department, acting through its leaders and policymakers the former and current Chief of Police, failed to appropriately discipline Officer Colwell for taking off his badge in front of an arrestee while in the sally port at Warren County Jail and continuing to threaten the arrestee in June 2020.

161. The McMinnville Police Department, acting through its leaders and policymakers the former and current Chief of Police, failed to appropriately discipline Officer Colwell for failing to wear a body camera as required by Department policy.

- 17 -

162. The McMinnville Police Department's failure to train, supervise, and discipline Officer Colwell, through its leaders and policymakers the former and current Chief of Police, demonstrates the McMinnville Police Department's deliberate indifference to the rights of citizens with whom Officer Colwell was going to interact.

163. The McMinnville Police Department's failure to train, supervise, and discipline Officer Colwell, through its leaders and policymakers the former and current Chief of Police, was closely related to and actually caused Mr. Martin's injuries.

    a. Had Officer Colwell been adequately trained to de-escalate situations, Officer Colwell would not have swiftly moved to using force with Mr. Martin, and Officer Colwell would have considered the totality of the circumstances, including dispatch's communications;

    b. Had Officer Colwell been appropriately supervised, he would have been on notice that his anger issues were not professional and he would have been wearing a body camera at the time of his interaction with Mr. Martin; and

    c. Had Officer Colwell been appropriately punished for his interaction with a citizen in June 2020, which included Officer Colwell threatening to kill the Suspect and taking his badge off in front of the Suspect, Officer Colwell would not have even been a member of the McMinnville Police Department, or at a minimum, would have received such a severe punishment as to discourage Officer Colwell from continuing to violate citizens' constitutional rights.

164. The McMinnville Police Department, acting through its leaders and policymakers the former and current Chief of Police, was aware of prior incidences of unconstitutional conduct by Officer Colwell.

- 18 -

165. The McMinnville Police Department, acting through its leaders and policymakers the former and current Chief of Police, failed to act in response to complaints of constitutional violations by Officer Colwell.

166. The McMinnville Police Department, acting through its leaders and policymakers the former and current Chief of Police, was clearly on notice that additional training in de-escalation and citizen encounters was deficient as it related to Officer Colwell and this deficiency was likely to cause further injury; nevertheless, the McMinnville Police Department ignored this history and pattern of abuse by Officer Colwell.

167. The McMinnville Police Department, acting through its leaders and policymakers the former and current Chief of Police, failed to equip Officer Colwell with the specific tools to handle recurring situations of citizen encounters through training Officer Colwell on how to consider all evidence, de-escalate tense situations rather than quickly resort to force, and behave professionally when carrying out his duties.

168. The McMinnville Police Department, along with its leaders and those entrusted with making policy for the Department, has been derelict in its duty to serve and protect the citizens of McMinnville, and those within McMinnville's jurisdiction, by permitting an officer clothed with the Department's authority and the power of the State to abuse people's rights without proper training, supervision, or discipline.

## V.    DAMAGES

169. Mr. Martin expressly incorporates every paragraph of this Complaint as if fully set forth within this claim for damages.

170. Mr. Martin has suffered physical injuries as a result of Officer Colwell's and the McMinnville Police Department's actions.

171. Mr. Martin has suffered emotional injuries as a result of Officer Colwell's and the McMinnville Police Department's actions.

172. Mr. Martin has endured deprivations of rights guaranteed to him by the Constitution of the United States of America by those charged with executing its protections.

173. Mr. Martin, through 42 U.S.C. § 1983, is entitled to recover damages from Officer Colwell for excessive force and false arrest and unreasonable seizure, as well as the costs of Mr. Martin's medical treatment associated therewith.

174. Mr. Martin, through 42 U.S.C. § 1983, is entitled to recover damages from the City of McMinnville, Tennessee, for failure to adequately train, supervise, and discipline Officer Colwell as part of a municipal policy or custom as directed by those charged with making policy decisions for the McMinnville Police Department, and Mr. Martin may recover the costs of Mr. Martin's medical treatment associated with the injuries caused by the McMinnville Police Department's failure to adequately train, supervise, and discipline Officer Colwell.

175. Mr. Martin, should he prevail in this action, is entitled to have his reasonable attorneys' fees paid by the Defendants, in the Court's discretion, pursuant to The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988(b) (2018).

**WHEREFORE, THE PLAINTIFF PRAYS:**

a) That proper process issue requiring the Defendants to answer this Complaint;

b) That Mr. Martin be awarded a judgment against Defendant Justin Colwell in a sum not to exceed five hundred thousand dollars ($500,000.00) in compensatory damages;

c) That Mr. Martin be awarded a judgment against Defendant City of McMinnville, Tennessee in a sum not to exceed five hundred thousand dollars ($500,000.00) in compensatory damages;

d) That the costs of this action be taxed to the Defendants;

e) That Mr. Martin's reasonable attorneys' fees be paid by the Defendants as costs pursuant to The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988(b) (2018);

f) That the doctrine of qualified immunity be deemed inconsistent with the text and intent of the Ku Klux Klan Act of 1871, and therefore abrogated and nullified as a defense to suit and liability under 42 U.S.C. § 1983;

g) That a jury of twelve (12) persons be empaneled to determine the factual issues in this matter; and

h) For such other and further relief that this Court deems appropriate.


Respectfully submitted,

BY:    GALLIGAN & NEWMAN


s/Michael D. Galligan
s/Bailey D. Barnes
Michael D. Galligan, BPR No. 3181
Bailey D. Barnes, BPR No. 039246
309 West Main Street
McMinnville, Tennessee 37110
t: (931) 473-8405 | f: (931) 473-1888
mgalligan@galligannewmanlaw.com
bbarnes@galligannewmanlaw.com
*Attorneys for David J. Martin*

- 21 -